IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

STEVEN C. TYLER,                          )
                                          )
            Plaintiff,                    )
                                          )
    v.                                    )   Case No. 05-00891-CV-W-REL-SSA
                                          )
JO ANNE B. BARNHART, Commissioner         )
of Social Security,                       )
                                          )
            Defendant.                    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Steven Tyler seeks review of the final decision of the Commissioner of Social

Security denying his application for disability insurance benefits under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title

XVI of the Act, 42 U.S.C. §§ 1381, et seq.  Plaintiff argues that the Administrative Law Judge

("ALJ") erred in: (1) discrediting his statements concerning his complete inability to work; (2)

finding that his mental impairments did not meet or equal the requirements of Listing 12.04C(3); and

(3) relying on the vocational expert's testimony, as the hypothetical did not accurately detail

Plaintiff's impairments.  I find that the ALJ properly (1) discredited Plaintiff's allegations of

complete inability to work, (2) found Plaintiff did not meet Listing 12.04C(3), and (3) relied on the

vocational expert's testimony to find Plaintiff could perform work that existed in the national

economy.  Therefore, Plaintiff's Motion for Summary Judgment will be denied and the decision of

the Commissioner will be affirmed.

## I. BACKGROUND

Plaintiff submitted a claim for both Social Security Disability Insurance Benefits and

Supplemental Security Income Benefits on March 11, 2003, and met the insured status requirements on July 1, 2001. Plaintiff's alleged disability and inability to work stems from depression, anxiety and a personality disorder. Plaintiff's application was denied initially and upon reconsideration. On October 28, 2004, a hearing was held before an ALJ. On April 27, 2005, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On July 26, 2005, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## *II. STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

2

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988)(discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983)(discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential

3

evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.      Is the claimant performing substantial gainful activity?
                Yes = not disabled.
                No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

                Yes = disabled.
                No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of Plaintiff,, medical expert Joseph Cools, Ph.D., vocational expert Lee Knutson, Plaintiff's case manager Jennifer Webster, as well as the documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

4

**Earnings Record**

Plaintiff's earnings record indicates that he earned the following income from since he

turned eighteen:

| Year | Amount |
|------|--------|
| 2000 | $2,730.00 |
| 2001 | 3,410.31 |
| 2002 | 4,465.68 |
| 2003 | 2,526.25 |
| 2004 | 0.00 |

(Tr. at 101-105, 107).

**Disability Report**

Plaintiff stated his depression limited his ability to work, as depression slowed his ability

to function and he was not able to work as much as the average person (Tr. at 108). During the

interview, Plaintiff was observed to have difficulty concentrating and answering questions (Tr. at

118).

**Daily Activities Questionnaire**

Plaintiff's mother, Brenda Carrel, completed a daily activities questionnaire dated March

29, 2003 (Tr. at 120). She stated Plaintiff did not socialize and kept to himself (Tr. at 120). Over

a six-year period, Plaintiff became increasingly isolated (Tr. at 120). He was currently homeless

and could not support himself (Tr. at 120). Mrs. Carrel stated, "He becomes completely

withdrawn at times. He becomes unresponsive and does not perform tasks asked of him." (Tr. at

120).

**B. SUMMARY OF MEDICAL RECORDS**

On May 24, 2000, Plaintiff presented to Marilyn Duke-Woodside, M.D., at the University

of Kansas Hospital for a pediatric neurology evaluation of his headaches (Tr. at 163-165).

Plaintiff reported daily headaches for almost two years (Tr. at 163). He also had been diagnosed with depression, for which he took Effexor XR[1] and Zyprexa[2] (Tr. at 163). Plaintiff's headaches were reportedly random and occurred in different locations with some dizziness and blurred vision as well as some sensitivity to light and sound (Tr. at 163). He told Dr. Duke-Woodside he had missed fourteen days from school for his symptoms (Tr. at 163). Eight years prior, he reportedly fell from a balcony about fifteen feet to concrete (Tr. at 163). Plaintiff also reported a history of long-term tremor in his hands that was present prior to the initiation of psychotropic medications (Tr. at 163). Past illness included a history of mental problems, for which he had been diagnosed and treated starting one year prior (Tr. at 164).

During physical examination, Plaintiff was very quiet with a constricted affect (Tr. at 164). Neurological examination showed a fine motor tremor present bilaterally in both hands (Tr. at 164). A previous MRI performed on October 25, 1999, and an EEG from October 19, 1999, were normal (Tr. at 164-165). Dr. Duke-Woodside assessed Plaintiff with (1) chronic daily headaches, possible post-traumatic headaches, (2) depression, by history, and (3) trauma. She started Plaintiff on Neurontin[3] at 300 mg with an increase to 600 mg (Tr. at 165).

---

[1] Effexor is an antidepressant "used to treat depression, panic disorder, generalized anxiety disorder, and social anxiety disorder." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03181a1;_ylt=AqasPfpGvrXtI5. Y71Y3i9skD7sF (last visited Dec. 11, 2006).

[2] Zyprexa is an antipsychotic medication "used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04050a1; _ylt=AiMeoIgEeue5ixHWjlq3mN4kD7sF (last visited Dec. 11, 2006).

[3] Neurontin "affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03182a1;_ylt=AlShWolwsyjN52oVHRT gh.0kD7sF (last visited Dec. 11, 2006).

On July 26, 2000, Plaintiff returned to Dr. Duke-Woodside (Tr. at 161-162). Dr.

Woodside indicted Plaintiff had been on the current dose of Neurontin for about two weeks (Tr.

at 161). His headaches were milder and less frequent and Plaintiff's mother indicated he seemed

a little more outgoing (Tr. at 161). Current medications included Effexor XR, Zyprexa and

several medications for asthma and allergies (Tr. at 161). Neurological examination revealed one

to two beats of clonus bilaterally (Tr. at 161). He had a mild tremor, but normal gait (Tr. at 162).

Dr. Duke-Woodside diagnosed Plaintiff with headaches that were improved on Neurontin (Tr. at

162).

Plaintiff received treatment for depression from Comprehensive Psychiatric Associates on

September 12, 2000 (Tr. at 206). He rated his mood as 5/10 (Tr. at 206). He was diagnosed with

mood disorder and schizotypal personality disorder as well as migraine headaches (Tr. at 206).

Medications included Effexor, Zyprexa, and Neurontin (Tr. at 206). On November 7, 2000,

Plaintiff's doctor discontinued Zyprexa (Tr. at 205). Plaintiff's January 23, 2001, records state

he was doing very well overall with significant improvement (Tr. at 204).

On May 24, 2001, Plaintiff presented to Comprehensive Psychiatric Associates for a

follow-up appointment (Tr. at 203). His medications include Effexor, 150 mg three times a day;

Neurontin, 600 mg twice a day and 900 mg once a day; and Depakote,[4] 250 mg twice a day and

500 mg once a day (Tr. at 203).

On July 24, 2001, Plaintiff saw Rajesh Pahwa, M.D., at the Kansas University Physicians

Tremor Disorder Clinic for an evaluation (Tr. at 158-160). Plaintiff reported a history of tremors

---

[4]Depakote treats seizure disorders, "helps prevent migraine headaches" and helps "control mania associated with bipolar disorder." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03833a1;_ylt=Au3qGQplq XEPKgPdS8e1wLYkD7sF (last visited Dec. 11, 2006).

that began approximately three to four months prior and involved both arms along with some movements in the neck, shoulders and legs (Tr. at 158). The tremor increased in severity for the first two weeks and, at that time, Plaintiff was hospitalized and underwent an extensive work up (Tr. at 158). He was found to have low ceruloplasmin levels; Wilson's disease was ruled out (Tr. at 158). At the time of his appointment, Plaintiff stated his tremors were under control overall, but still had spells lasting anywhere from a few hours to a few days when he experienced marked involuntary movements in his arms, legs, shoulder and neck (Tr. at 158). During these spells he had some mental and personality changes such as becoming more withdrawn and depressed (Tr. at 158). He had increased difficulties with activities of daily living and often required assistance (Tr. at 158). Plaintiff also had a history of chronic headaches, lightheadedness, and occasional tingling numbness (Tr. at 158). He was unsteady during the tremor spells (Tr. at 158). Current medications included: Neurontin, 600 mg twice a day, 900 mg at bedtime; Effexor; Serevent;[5] Flovent;[6] Nasonex;[7] and Claritin D[8] (Tr. at 158).

General examination revealed Plaintiff appeared slightly depressed and in no apparent distress (Tr. at 159). Neurological examination revealed Plaintiff's gait was normal except there was decreased arm swing bilaterally (Tr. at 159). Plaintiff did not have any evidence of a face,

---

[5]Serevent is used to treat asthma. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03759a1;_ylt= Alu7FXfAcfzeN7Y3iBTs7VEkD7sF (last visited Dec. 11, 2006).

[6]Flovent is a steroid used to prevent asthma attacks. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/ drug/ d01296a1;_ylt=As9gSaHBHId9.XI6Dk1mi5AkD7sF (last visited Dec. 11, 2006).

[7]Nasonex is a steroid used "to prevent and treat the nasal symptoms of allergies." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04223a1;_ylt=AnAHGQ_kOgzqLIIaRRYO5BskD7sF (last visited Dec. 11, 2006).

[8]Claritin D is an antihistamine. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03818a1;_ylt= Ahwg6IKttGJL0RG0nFNeyp8kD7sF (last visited Dec. 11, 2006).

voice or head tremor (Tr. at 159). He did have a grade 1/4 postural and kinetic tremor in his left

hand and a grade 1/4 kinetic tremor in his right hand (Tr. at 159-160). Deep tendon reflexes

were decreased bilaterally at the biceps, triceps, brachioradialis, knees and ankles (Tr. at 159).

Dr. Pahwa was concerned the episodes could be epileptiform seizures and recommended Plaintiff

return during a spell (Tr. at 160). He also noted Plaintiff had a underlying slight tremor believed

to be related to anxiety (Tr. at 160).

On July 28, 2001, Plaintiff went to the University of Kansas Hospital Emergency Room

with complaints of shaking (Tr. at 147, 149). Physical examination revealed constant unusual

wiggling of the neck, head and upper extremities (Tr. at 148). Plaintiff was prescribed Valium[9]

for two to three days until seen by a psychiatrist and an outpatient EEG was recommended (Tr. at

151).

On July 31, 2001, Plaintiff presented to Comprehensive Psychiatric Associates with

complaints of anxiety (Tr. at 202). His affect was flat (Tr. at 202). Medications included

Valium, Effexor, and Neurontin (Tr. at 202).

On August 7, 2001, Plaintiff underwent an electroencephalpgraphy[10] (Tr. at 157). Dr.

Nowack thought Plaintiff's discharges were myogenic[11] (Tr. at 157). Tracing did not show

significant abnormality (Tr. at 157).

---

[9]Valium "is used to relieve anxiety, nervousness, and tension associated with anxiety disorders. It is also used to treat certain types of seizure disorders and muscle spasms." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/ drug/d00148a1;_ylt=Al2zlangBmM6KzuzgE77q4skD7sF (last visited Dec. 11, 2006).

[10]"Electroencephalpgraphy" is the "[r]egistration of the electrical potentials recorded by an electroencephalograph." An "electroencephalograph" is a "system for recording the electric potentials of the brain derived from electrodes attached to the scalp." STEDMAN'S MEDICAL DICTIONARY 552 (26th ed. 1995).

[11]"Originating in or starting from muscle." STEDMAN'S MEDICAL DICTIONARY 1168 (26th ed. 1995).

9

On August 14, 2001, Plaintiff returned to Comprehensive Psychiatric Associates (Tr. at 201). Mental status examination revealed a flat affect and decreased eye contact (Tr. at 201). Plaintiff was continued on Effexor XR (Tr. at 201).

On August 23, 2001, Plaintiff was seen at the University of Kansas Hospital for unclassified seizures (Tr. at 167). He was admitted for prolonged video EEG for classification of his seizures (Tr. at 167). His discharge diagnosis was non-epileptic seizures (Tr. at 167).

On August 25, 2001, Plaintiff complained of a depressed mood (Tr. at 168). He denied any feelings of hurting himself (Tr. at 168). He reported difficulty sleeping (Tr. at 168). Plaintiff stated he did not have any close friends (Tr. at 168). His depression worsened after the "jerky movements" and he remained confused for some time (Tr. at 168). Plaintiff denied persecutory/ grandiose delusions (Tr. at 168). Past medical history included a psychiatric hospitalization in May of 2001 (Tr. at 168). Plaintiff was placed on medication at age 12 because he was isolative and withdrawn (Tr. at 168). Physical examination revealed Plaintiff's affect was restricted (Tr. at 168). His thought process was good and he denied any suicidal ideation (Tr. at 168). Plaintiff's assessment included monitoring his mood and behavior, as well as considering adjusting his Effexor dose (Tr. at 168).

On October 2, 2001, Plaintiff was seen at Comprehensive Psychiatric Associates (Tr. at 200). Examination revealed he remained isolated and withdrawn (Tr. at 200). Plaintiff was continued on Neurontin and Effexor 225 mg (Tr. at 200).

On December 4, 2001, Plaintiff was voluntarily hospitalized at Baptist-Lutheran Medical Center for treatment of depression and suicidal ideation (Tr. at 171-175). He noted problems of low energy level, poor attention and concentration, decreased interest and enjoyment in life. He

also noted problems with sleep and had found himself ruminating and worrying about things as well as experiencing periodic problems with crying spells (Tr. at 174). He had a significant history of depression as well as dysthymia[12] (Tr. at 174). One of the significant triggers that led to hospitalization was the fact that Plaintiff was not allowed back into his mother's home unless he was able to find full-time employment (Tr. at 171). He had been living in his car and stated he had been feeling suicidal before coming into the hospital (Tr. at 171).

Plaintiff was placed on Effexor XR, 300 mg daily; 15 mg Remeron[13] at night; and 10 mg Adderall[14] twice daily (Tr. at 171). Trazodone[15] was discontinued (Tr. at 171). Throughout his hospitalization, Plaintiff's affect remained flat (Tr. at 171). He participated minimally in groups (Tr. at 171). Upon discharge, he stated that his mood was "better" (Tr. at 171). His discharging diagnosis on December 10, 2001, included major depressive disorder, recurrent, severe, without psychotic symptoms; dysthymia; and personality disorder, not otherwise specified (Tr. at 171). His global assessment of functioning ("GAF") scale score upon admission was 30 and 60[16] upon

---

[12]Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995).

[13]Remeron is an antidepressant. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04025a1;_ylt= AgmP_d2eh4Q_LvISmUq2CVAkD7sF (last visited Dec. 11, 2006).

[14]Adderall is a stimulant and appetite suppressant and can be used to treat attention deficit disorder. Yahoo! Health, Drug Guide, at http://health.yahoo.com/drug/d04035a1;_ylt=ArNygpNEFg0ItnZIuE2UJ0AkD7sF (last visited Dec. 11, 2006).

[15]Trazodone is an antidepressant. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00395a1;_ ylt=At1SdQo3UeH9.pmYhhoyZVokD7sF (last visited Dec. 11, 2006).

[16] The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people over 18 years of age and older. It excludes physical and environmental impairments. A GAF of 30 indicates a "serious impairment in ability to communicate with others, [a] serious impairment in judgment, [or an] inability to function in almost all areas." Barbara L. Brown, Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V), at

discharge (Tr. at 171).

On December 27, 2001, Plaintiff presented to Comprehensive Psychiatric Associates for follow up after his stay at Baptist Medical Center (Tr. at 199). His response was noted to be improved (Tr. at 199). Plaintiff was diagnosed with a mood disorder and schizoid personality disorder (Tr. at 199).

On December 24, 2002, Plaintiff was seen at TMC-Behavioral Health and requested assistance locating and maintaining full-time employment (Tr. at 244). He reported previous treatment for depression but declined medication at that time (Tr. at 224). Plaintiff appeared to possibly have some cognitive impairments based on poor memory and slow speech (Tr. at 224). Dr. Rogers noted that testing might be warranted to assess strengths/deficits in order to provide assistance with locating appropriate long-term employment (Tr. at 224). Plaintiff was referred for career counseling (Tr. at 225).

On January 2, 2003, Plaintiff underwent a psychotherapy treatment assessment (Tr. at 218). He requested therapy to help address life problems, work adjustment and to develop goals (Tr. at 218). Plaintiff appeared to have some cognitive deficits as evidenced by poor memory and cognitive confusion (Tr. at 218). He identified current symptoms of depression, anxiety, confusion, shakes, and having ongoing "mental" struggles and a "dark feeling" - - all of which he felt contributed to his inability to maintain full-time employment, interpersonal relationships and accomplish life goals (Tr. at 218). Further assessment was needed to determine how severely Plaintiff was impacted by his severe and persistent mental illness and how it was impacting his

---

http://www.gpc.edu/~bbrown/psyc2621/ch3/gaf.htm (last visited Dec. 11, 2006). A GAF score ranging from 51 to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning." Id.

occupational success (Tr. at 218).

On March 7, 2003, Plaintiff underwent a psychological evaluation at TMC Behavioral Health (Tr. at 214-217). He reported feeling depression "on and off" (Tr. at 215). He also reported decreased sleep, decreased appetite, waking in the night and being unable to go back to sleep (Tr. at 215). Dr. Israel noted Plaintiff had a history of physical abuse, sexual molestation, difficulty at school and holding a job (Tr. at 216). Plaintiff was diagnosed with major depressive disorder, recurrent (Tr. at 217). Dr. Israel started Plaintiff on Lexapro and recommended Plaintiff continue therapy and undergo vocational rehabilitation (Tr. at 217).

On March 28, 2003, Plaintiff presented to TMC Behavioral Health for an initial assessment (Tr. at 295-314). He stated he wished to receive services, "because I have trouble on my job, and things aren't going right for me" (Tr. at 295). Plaintiff's affect was euthymic but he was guarded regarding his symptoms of his mental illness (Tr. at 297-298). He had insight into his symptoms and was able to develop treatment plan goals such as obtaining stable housing, attending therapy, and being referred to vocational rehabilitation (Tr. at 298). He continued to be hesitant about taking psychiatric medications to reduce symptoms, due to possible side effects (Tr. at 298). He was assessed with major depressive disorder, recurrent (Tr. at 298). His current GAF was 45[17] (Tr. at 298).

Plaintiff reported that he prepared meals for himself at ReStart (Tr. at 301). He did his own laundry and was able to keep his living environment clean and picked up (Tr. at 300-301). He stated he began to experience increased stressors at college, due to class schedules, work

---

[17]A GAF of 45 indicates serious symptoms or " serious impairments in one of the following: social, occupational, or school functioning." Id.

difficulties, and conflict with his mother (Tr. at 302). He had been working at Sonic for over a year (Tr. at 302). He had some work skills and a sporadic work history. Recently, Plaintiff had experienced an increase in symptoms, such as anxiety and feelings of depression, due to stress from his job (Tr. at 302). This had resulted in increased conflicts with co-workers, decreased attendance, and difficulty completing work duties (Tr. at 302). He had continued feelings of depression and a recent increase in severity of symptoms due, in part, to noncompliance with medications, a stressful living environment, and a minimal social support system (Tr. at 303).

On April 11, 2003, Plaintiff presented to TMC Behavioral Health for follow up (Tr. at 274). He reported doing slightly better since he was started on Lexapro (Tr. at 274). He continued to reside at ReStart, and worked three hours a day at Sonic, Monday through Thursday (Tr. at 274). He complained of difficulty falling asleep and continued to be isolative (Tr. at 274). He was shy and initially guarded (Tr. at 274). Plaintiff's mood was depressed with appropriate affect (Tr. at 274). He was to increase his dosage of Lexapro to 20 mg a day and continue Trazodone at 50mg every hour as needed (Tr. at 274). He was diagnosed with major depressive disorder, recurrent and post-traumatic stress disorder (Tr. at 274).

On May 5, 2003, David O. Hill, Ph.D., completed a Psychiatric Review Technique form concerning Plaintiff (Tr. at 231-244). Dr. Hill noted Plaintiff's medical disposition was based on affective disorder, anxiety-related disorders, and personality disorders (Tr. at 231). Regarding affective disorder, Plaintiff's depressive syndrome was characterized by sleep disturbance, psychomotor agitation or retardation, and difficulty concentrating or thinking (Tr. at 234). His anxiety was evidenced by recurrent and intrusive recollections of a traumatic experience, which were a source of marked distress (Tr. at 236). His restriction of activities of daily living were

14

mild in limitation (Tr. at 241). However, difficulty maintaining social functioning, concentration, persistence, or pace were moderate in limitation (Tr. at 241).

Plaintiff was seen on May 23, 2003, at TMC Behavioral Health (Tr. at 273). He reported that, since his last visit, he becomes depressed two to three days per week (Tr. 273). He continued to work at Sonic Monday through Thursday (Tr. at 273). Although he was residing at ReStart, he was behind on rent (Tr. at 273). Plaintiff reported his mood was "okay" (Tr. at 271). Plaintiff was diagnosed with major depressive disorder, recurrent, and post-traumatic stress disorder and instructed to increase his dose of Lexapro to 10mg three times a day, and continue with Trazodone every hour as needed (Tr. at 273).

On July 18, 2003, Plaintiff was seen at TMC Behavioral Health and reported, "I'm better" (Tr. at 271-272). He had increased socialization with old friends but continued to have difficulty initiating new contacts (Tr. at 271). He was assessed as "improving" (Tr. at 272). Plaintiff was instructed to discontinue Trazodone and placed on Lexapro, 30 mg every day (Tr. at 272).

On September 4, 2003, Plaintiff arrived at Rockhill Manor for admission after leaving ReStart (Tr. at 283-286). The examining doctor noted Plaintiff was unable to live alone due to multiple medical and psychiatric disorders and required a safe living environment (Tr. at 283-284).

Plaintiff had a September 12, 2003, appointment at TMC Behavioral Health (Tr. at 269-270). He reported moving to Rockhill Manor two weeks prior and having quit his job at Sonic; he planned to join vocational rehabilitation soon (Tr. at 269). Mental status examination revealed his concentration was fair, mood to be "fine," and his affect within normal range (Tr. at 270). Plaintiff was assessed as stable (Tr. at 270). He was continued on Lexapro and started on

Remeron, 15mg every night (Tr. at 270).

On November 14, 2003, Plaintiff was seen again at TMC Behavioral Health (Tr. at 267-268). He was diagnosed with major depressive disorder, recurrent, moderate, and assessed as stable (Tr. at 267). His mood was "fine," affect was within normal range and his attention and concentration were good (Tr. at 268). Current medications included Lexapro, one and a half 20 mg tablets per day, and Remeron, 30 mg every night (Tr. at 268).

On February 6, 2004, Plaintiff had another appointment at TMC Behavioral Health (Tr. at 265-266). He continued to reside at Rockhill Manor (Tr. at 265). He denied any mood symptoms, his sleep and appetite were good, but his affect was flat (Tr. at 265). Plaintiff was diagnosed with major depressive disorder, recurrent, and assessed as stable (Tr. at 265). Medications included Lexapro and Remeron (Tr. at 266).

On March 26, 2004, Plaintiff underwent an initial assessment at TMC Behavioral Health (Tr. 258-264). He stated he sought services to "know what is going on" (Tr. at 255). He hoped to get into college so that he could get a job and maintain stability (Tr. at 255). Current medications included Lexapro and Remeron (Tr. at 256). He vowed compliance with medication and reported they help him to not be as depressed, "I have depression a little, but not as severe." (Tr. at 256). Plaintiff reported his medications helped him get "restful sleep" and that he no longer had nightmares or vivid dreams (Tr. at 256). Plaintiff had been in individual therapy until October of 2003, when he quit attending and participating during sessions; he was then discharged due to lack of participation (Tr. at 257). He did not have any interest in returning to therapy (Tr. at 257).

During the Dr. Amiri's assessment, Plaintiff reported his overall mood as stable and

16

stated he was not "extremely happy, but good" (Tr. at 257).  Over the past year, he had continued

to experience feelings of depression, such as helplessness and hopelessness, anxiety, confusion,

and panic attacks (Tr. at 257).  He had difficulty with multitasking and experienced unstable

mood swings (Tr. at 257).  He also stated he sometimes became easily overwhelmed and had

difficulty completing tasks on time (Tr. at 257).  Plaintiff was somewhat guarded and evasive

regarding his symptoms (Tr. at 257).  He was diagnosed with major depressive disorder,

recurrent, with a GAF was 50[18] (Tr. at 258).

With regard to Defendant's independent living capacity, Dr. Amiri stated that Plaintiff

did not currently have any income (Tr. at 259).  He was knowledgeable about community safety

practices, the Metro bus system, practiced good personal care and hygiene, and could prepare his

own meals -- although this need was currently being met by Rockhill Manor staff (Tr. at 259).

Plaintiff stated he tended to isolate himself from others and was distrustful (Tr. at 260).

He had, however, been able to integrate into the Rockhill community and had friends there; he

also went to "The Place" three times per week with friends (Tr. at 260).

Plaintiff moved to Rockhill in September of 2003 (Tr. at 261).  From January of 2003

until September of 2003, he had lived at ReStart (Tr. at 261).  Before that, he was at the City

Union Mission for a month and a half (Tr. at 261).  He had previously lived in an apartment, but

left after two months because he could not afford rent (Tr. at 161).  He was employed at Sonic

until September of 2003 when he quit the job due to increased psychological symptoms (Tr. at

261).  Over the past year, he had increased his social interactions and developed a greater support

_____

[18]A GAF of 50 indicates serious symptoms or "serious impairments in one of the following: social,
occupational, or school functioning."  Id.

17

system (Tr. at 261). He continued to struggle with feelings of depression, anxiety, panic attacks, racing thoughts, cognitive confusion, disrupted sleep due to nightmares and vivid dreams, and excessive worry related to his family and future life situation (Tr. at 262). Plaintiff's lack of trust, depressed mood and social isolation prevented him from being independently successful with employment and previous college training (Tr. at 262).

However, Dr. Amiri noted Plaintiff had been able to establish healthy relationships with others, contribute to his decreased social isolation and was willing to follow treatment recommendations that would improve his overall quality of life (Tr. at 262). Plaintiff had also overcome his resistance to taking medications and been compliant with his prescribed regiment, which helped him more effectively manage his symptoms and attain a level of stability as evidence by his ongoing participation in Vocational Rehabilitation to either return to college or obtain employment, increased social contacts and involvement with others, and maintaining stable supportive housing (Tr. at 262). Dr. Amiri assessed Plaintiff's prognosis for treatment as "good," provided he continued to comply with medications and maintained consistent contact with his Community Support Worker to help manage life stressors (Tr. at 262).

Dr. Amiri's recommendations included: (1) medication services to help manage feelings of depression, anxiety, disrupted sleep, and excessive worry; (2) maintain stable supportive housing placement providing him with a safe environment to pursue his goals as he continues to learn coping skills to manage daily life stressors contributing to feelings of depression and anxiety; (3) continued participation in vocational rehabilitation to return to college as he was unable to complete college in the past due to depression, anxiety, and disrupted sleep as well as lack of needed support services; (4) follow up with Social Security appeal process to provide him

18

with a source of income until he is able to obtain and maintain competitive employment; (5)

develop coping skills to help manage feelings of depression and excessive worry; and (6)

continued participation in social activities to provide him with a natural social support and trust

in others (Tr. at 263).

On May 18, 2004, Plaintiff was seen at TMC Behavioral Health (Tr. at 253-254). He

missed his last appointment but continued to receive medications (Tr. at 253). Plaintiff did not

endorse any anxiety, psychotic, cognitive or mood symptoms (Tr. at 253). Dr. Amiri noted

Plaintiff's speech was at a normal rate, he had normal motor activity, affect was appropriate, and

his thought process was intact (Tr. at 254). Plaintiff's medications included Lexapro, one and a

half 20 mg tablets a day, and Remeron, 30 mg at bedtime; side effects of the medication included

an increased appetite (Tr. at 253). Dr. Amiri continued Plaintiff on his current medications but

stated they would consider tapering him off of Remeron (Tr. at 254). Plaintiff was diagnosed

with major depressive disorder, recurrent, moderate (Tr. at 253-254).

Plaintiff had a June 28, 2004, appointment at TMC Behavioral Health and reported

minimal symptoms (Tr. at 251). He stated he felt decreased depression and had not experienced

any crying spells (Tr. at 251). Plaintiff was diagnosed with major depressive disorder, recurrent,

moderate (Tr. at 251).

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On May 5, 2003, Dr. Hill completed a Mental Residual Functional Capacity Assessment

(Tr. at 245-249). Dr. Hill noted Plaintiff's ability to maintain attention and concentration for

extended periods, work in coordination with or proximity to others without being distracted by

them, and interact appropriately with the general public were all moderately limited (Tr. at 245-

19

246).  Plaintiff was not significantly limited in his ability to remember locations and work-like procedures, understand and remember very short and simple or detailed instructions, carry out short or detailed instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately respond to changes in the work setting, be aware of normal hazards and take precautions, travel in unfamiliar places or use public transportation, set realistic goals, or make plans independently of others (Tr. at 245-246).  Based on these results, the counselor opined that Plaintiff could return to his past work as a fast food cook (Tr. at 249).

### D.  SUMMARY OF TESTIMONY

During the hearing, Plaintiff; Joseph Cools, Ph.D., medical expert; Lee Knutson, vocational expert; and Jennifer Webster, Plaintiff's caseworker; testified at the request of the ALJ.

### 1.    Plaintiff's testimony

At the October 28, 2004, hearing, Plaintiff testified that he was 22 years old and had obtained a GED (Tr. at 28).  He last worked at Sonic in September of 2003 on a part-time basis (Tr. at 28-29).  He had also worked at Pizza Hut and at an arcade as a carousel manager (Tr. at

Case 4:05-cv-00891-REL   Document 12   Filed 12/15/06   Page 20 of 34

29-30).  Plaintiff stated he tried to attend college and work part-time, but was not successful due to depression (Tr. at 32).

Plaintiff testified he was hospitalized for depression for one week in 2001 at Trinity North, but was not prescribed any medication (Tr. at 32-33).  He was hospitalized for his depression again in 2002 (Tr. at 42).  Circumstances leading to this second hospitalization included his job not going well, being kicked out of his mom's house and living in a car, and being in a really "dark place" (Tr. at 42).

Plaintiff was currently taking three credit hours at a community college (Tr. at 33).  He attended class three days a week for 50 minutes (Tr. at 46).  When not in school, Plaintiff works on assignments, reads, plays video games, listens to music, and visits with his friends at Rockhill (Tr. at 46-47).  Sometimes his thoughts drift and he finds it hard to focus (Tr. at 47).  Plaintiff started the semester taking nine credit hours, but had to drop two classes; he dropped one class because it was too stressful and the other because he fell behind after missing class (Tr. at 33).  He said he missed school because of stress and depression (Tr. at 45).  Plaintiff testified he had missed more than five days in his school term because he had trouble getting up and getting to school (Tr. at 33-34).

At the time of the hearing, Plaintiff lived at Rockhill Manor, a residential care facility, with a roommate (Tr. at 34, 35).  He said he had lived there since September of 2003 (Tr. at 37).  Plaintiff's meals are prepared for him, but he is expected to keep his room clean and do his own laundry (Tr. at 47).  Dr. Murray visits and treats Plaintiff for his physical ailments (Tr. at 35-36).  Before living at Rockhill Manor, Plaintiff lived for less than a year at ReStart and at the City Union Mission when he was homeless (Tr. at 34-35).  He also had lived in his own apartment,

but had to move out after falling behind on rent (Tr. at 35).

Plaintiff testified he received treatment from a psychiatrist for depression and insomnia (Tr. at 38). He was diagnosed with depression during high school and his doctor started him on Effexor (Tr. at 38). He did not take medication during periods when he did not have insurance, but was currently taking Lexapro (Tr. at 38). Plaintiff said medication helps with his depression when he is calm (Tr. at 44). In describing his symptoms, Plaintiff said he feels a dark kind of void, isolated, overwhelmed, and anxious (Tr. at 39). He said he becomes anxious when he is around other people, especially if they are angry (Tr. at 40). He said takes Remeron to help him sleep and sometimes wakes during the night (Tr. at 40). Plaintiff testified his appetite was good, and attributed this to the fact that events in his life had stabilized (Tr. at 40). Plaintiff stated he suffered a head injury when he was younger and suffers from frequent headaches (Tr. at 45). He gets headaches approximately every other day and takes Ibuprofen (Tr. at 46).

Plaintiff has received case management services for two years (Tr. at 40-41). His current caseworker is Jennifer Webster (Tr. at 41). She meets with him once a week and accompanies him to his doctor appointments (Tr. at 41).

Plaintiff testified he did not feel he could work due to his depression (Tr. at 43). Recent bosses and co-workers have told him he is too slow (Tr. at 43). When Plaintiff works over three hours, he becomes anxious and tired (Tr. at 43-44). He feels he cannot keep up and has a hard time completing tasks (Tr. at 44). On average, Plaintiff stated he misses two or three days a week from work (Tr. at 45).

## 2. Testimony of Medical Expert

Joseph Cools, Ph.D., testified at the hearing as a medical expert (Tr. at 48-55). He stated

Case 4:05-cv-00891-REL   Document 12   Filed 12/15/06   Page 22 of 34

that Plaintiff had a diagnosis of major depressive disorder, recurrent (Tr. at 49). He noted Plaintiff struggled with depression much of his life, even before adolescence, and had been hospitalized for depression two times (Tr. at 49). Dr. Cools testified Plaintiff did have the ability to relate to others when he had to (Tr. at 49). He stated Plaintiff had consistent feelings of depression, including minor vegetative symptoms but no severe vegetative symptoms (Tr. at 49). Plaintiff felt helpless and hopeless, and experienced anxiety and occasional panic attacks and mood swings (Tr. at 49). Dr. Cools said Plaintiff has a severe mental impairment, but is able to perform at least minimal activities of daily living and can care for his basic needs (Tr. at 49-50). He opined Plaintiff did not meet or equaled the listings, either 12.04 or 12.06 (Tr. at 50).

Plaintiff's attorney asked Dr. Cools whether, in determining that Plaintiff did not meet or equal 12.04C(3), he had considered that Plaintiff was living in a residential care facility and had been for over a year (Tr. at 50-51). Dr. Cools responded that the record was unclear as to why Plaintiff was still living in a residential care facility; if treating sources or people taking care of Plaintiff said he was unable to exist outside a sheltered environment, Dr. Cools testified Plaintiff would qualify for listing level 12.04C criteria (Tr. at 51). He testified that Plaintiff's psyche CE did not seem as restrictive as one who would be required to live in a shelter facility due to an inability to cope with outside pressures (Tr. at 52). Dr. Cools testified that Plaintiff's GAF score of 50 would indicate serious symptoms with impressive limitations, but should be adequate for the minimal of any kind of living (Tr. at 52). Plaintiff only demonstrated moderately impaired activities of daily living (Tr. at 52-53). Dr. Cools stated that a GAF of 50 did not translate into having to live in a sheltered facility (Tr. at 53). He also stated that a GAF score is only valuable when corroborated by other evidence (Tr. at 53). For instance, a person with a GAF of 50, who

lived in a sheltered facility, and about whom independent sources indicated he was unable to function, would qualify under the "C" criteria of listing 12.04 (Tr. at 54).

### 3.   Testimony of Vocational Expert

Lee Knutson, a vocational expert, also testified at the hearing (Tr. at 55-60). He classified Plaintiff's past relevant work as a fast food worker, cashier, and carousel operator as light and unskilled (Tr. at 56).

The ALJ posed a hypothetical question in which he assumed Plaintiff's age, education, and work experience (Tr. at 56). In addition, he assumed that:

> [T]his person needs to avoid interacting with the public. This person can follow simple instructions. This person needs to avoid concentrated exposure to dust, gases, fumes, odors, and poor ventilation. This person should avoid close interaction with co-workers such as a member of a team. This person could maintain routine interaction with co-workers and supervisors. Could that person do any of the past jobs? There are no limits on sitting, standing, walking, lifting, pushing, or pulling.

(Tr. at 56-57). Mr. Knutson replied that such an individual could not perform past relevant work because of the public interaction (Tr. at 57). He stated there were other medium, unskilled jobs such an individual could perform, such as packer, packager, assembler, and warehouse laborer (Tr. at 57). Light, unskilled jobs included a packer and production assembler (Tr. at 58). Sedentary jobs would include a bench assembler, inspector, weigher, sampler, and checker (Tr. at 58). Mr. Knutson testified that all of these jobs exist in significant numbers (Tr. at 57-58).

Plaintiff's counsel then asked Mr. Knutson to assume that the hypothetical person could only maintain attention and concentration for extended periods of time for up to one third of the day (Tr. at 59). Mr. Knutson responded that such person would not be employable (Tr. at 59). Plaintiff's counsel next asked how many days of work the hypothetical person could miss and

still sustain competitive employment (Tr. at 59). Mr. Knutson testified that if such a person were absent more than two days each month it would be unlikely he or she could keep a job (Tr. at 59-60).

### 4. Testimony of Jennifer Webster

Jennifer Webster, Plaintiff's caseworker from Truman Medical Center Behavioral Health Services, also testified at the hearing (Tr. at 60-63). Although she had only been Plaintiff's case manager since August of 2004, she was familiar with Plaintiff's mental health condition from reviewing his case records (Tr. at 61). Ms. Webster's primary goal is to help her clients stay out of state hospitalizations (Tr. at 61). She helps maintain stability in mental and physical health services (Tr. at 61). Ms. Webster testified that she did not think Plaintiff could live on his own at the current time (Tr. at 62). Her opinion was based on Plaintiff's current level of depression (Tr. at 62). Ms. Webster stated Plaintiff tends to isolate himself and becomes very anxious and easily overwhelmed with tasks (Tr. at 62). She noted Plaintiff had to drop two classes because he became more anxious, depressed, and isolated (Tr. at 62-63). She believed the same thing would happen in a job situation, in that he would become overwhelmed and not be able to work and, in turn, be unable to support himself and provide for his physical and mental health needs (Tr. at 63).

### E. FINDINGS OF THE ALJ

On April 27, 2005, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 23). At step two, the ALJ found Plaintiff's depression, anxiety and personality disorder were "severe" impairments (Tr. at 23).

25

However, he found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing (Tr. at 23). At step four, the ALJ found Plaintiff was unable to perform any past relevant work (Tr. at 23). Finally, the ALJ found there were a substantial number of jobs existing in the national economy that Plaintiff could perform (Tr. at 23-24).

## V. CREDIBILITY OF PLAINTIFF

Plaintiff contends that the ALJ erred in discrediting his statements concerning his complete inability to work.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's allegation of a complete inability to work is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.

In determining credibility, consideration must be given to all relevant factors, including a plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 at 1322.

The specific reasons for discrediting Plaintiff's subjective complaints are as follows:

## 1. PRIOR WORK RECORD

Plaintiff's earnings record demonstrates that he worked sporadically and earned very little over his lifetime. His highest annual earnings occurred in 2002 when he made $4,465.68. Plaintiff did not work in 2004. His average annual earnings for the four years he did work is $3,283.06. Therefore, this factor does not support the ALJ's determination.

## 2. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

On January 23, 2001, a time at which he was taking his medications, Plaintiff's medical records state he was doing very well overall with significant improvement (Tr. at 204). An examination on July 24, 2001, during which time he was also medicated, revealed Plaintiff appeared only slightly depressed (Tr. at 159). Plaintiff declined medication for his depression on December 24, 2002 (Tr. at 224). On March 28, 2003, Plaintiff's doctor attributed an increase in the severity of Plaintiff's symptoms, in part, to noncompliance with his medication regimen (Tr. at 303). On April 11, 2003 Plaintiff reported doing better after starting Lexapro (Tr. at 274). Plaintiff's medications were gradually increased (See Tr. at 272, 273, 274). On July 18, 2003, Plaintiff reported, "I'm better" (Tr. at 271-272). By September 12, 2003, Plaintiff was assessed as stable; his was concentration was fair, mood was "fine," and affect was within normal range

(Tr. at 270).

On March 26, 2004, Plaintiff vowed compliance with his medication regimen and reported it helped him to be less depressed stating, "I have depression a little, but not as severe" (Tr. at 256). He also stated the medications helped him get "restful sleep" and that he no longer had nightmares or vivid dreams (Tr. at 256). Dr. Amiri stated that by overcoming his resistence to taking medications and having been complaint with the prescribed regiment, Plaintiff was able to more effectively manage his symptoms and maintain a level of stability (Tr. at 262). Dr. Amiri assessed Plaintiff's prognosis for treatment as "good," provided he continued to comply with his medication regimen and maintain contact with his Community Support Worker (Tr. at 262).

On May 18, 2004, the doctor noted Plaintiff had continued to receive medications (Tr. at 253). Plaintiff did not endorse any anxiety, psychotic, cognitive or mood symptoms (Tr. at 253). Again on June 28, 2004, Plaintiff reported only minimal symptoms and stated he felt decreased depression and had not experienced any crying spells (Tr. at 251). His doctor was considering tapering him off of Remeron (Tr. at 253). Plaintiff testified at the hearing that medication helps with his depression (Tr. at 44).

The record shows Plaintiff was hesitant about taking psychiatric medications due to possible side effects (Tr. at 298). The only side effects mentioned in the record were an increased appetite and cholesterol level. Plaintiff also argues that he "was off his medication when he did not have insurance." However, Plaintiff did not offer any evidence to substantiate this reason for noncompliance. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994). This factor weighs in favor of the ALJ's credibility determination.

### 3. DAILY ACTIVITIES

The record contains relatively little evidence concerning Plaintiff's activities of daily living. In his Disability Report, Plaintiff stated that his depression limited his ability to work as he was unable to work as much as an average person (Tr. at 108). Plaintiff testified at the hearing that he was currently taking three credit hours at a community college (Tr. at 33). He attends class three days a week for fifty minutes (Tr. at 46). When not in school, Plaintiff works on assignments, reads, plays video games, listens to music, and visits with friends and Rockhill (Tr. at 46-47). Plaintiff also keeps his room clean and does his own laundry (Tr. at 47). Similarly, the medical evidence of record shows that, when complaint with his medication regimen, Plaintiff had been able to establish healthy relationships, decrease his social isolation and follow treatment recommendations that will improve his overall quality of life (Tr. at 262). This factor supports the ALJ's decision.

### 4. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Again, when Plaintiff is taking his medication as prescribed, the record demonstrates he experiences significantly decreased symptoms. On May 23, 2003, Plaintiff stated he only felt depressed two or three days per week (Tr. at 273). He reported, "I'm better," on July 18, 2003 (Tr. at 271-272). On March 24, 2004, he stated, "I have depression a little, but not as severe" (Tr. at 256). Plaintiff did not endorse any anxiety, psychotic, cognitive or mood symptoms on May 18, 2004; additionally, his speech was at a normal rate, he had normal motor activity, motor activity was normal, and his thought process was intact (Tr. at 253-254). On June 28, 2004, Plaintiff reported minimal symptoms, stated he felt decreased depression, and had not experienced any crying spells; his doctor was considering tapering him off of Remeron (Tr. at

251).  This evidence demonstrates that Plaintiff can control his symptoms with medication to a level that would not support the allegation that he is completely unable to work.

### 5.  PRECIPITATING AND AGGRAVATING FACTORS

On January 2, 2003, Plaintiff stated his ongoing mental struggles had contributed to his inability to maintain full-time employment (Tr. at 218).  In March of 2003, Plaintiff's depression became more severe due to increased stressors at college, his class schedule, work difficulties, and conflict with his mother (Tr. at 302).  This had resulted in increased conflicts with co-workers, decreased attendance, and difficulty completing work duties (Tr. at 302).  As stated above, however, Plaintiff's increased symptoms corresponded to his noncompliance with his medication regimen (Tr. at 303).  Plaintiff also testified that he became anxious around other people, especially if they were angry (Tr. at 40).  On May 5, 2003, Dr. Hill found Plaintiff's ability to work in coordination with or in proximity to others without being distracted by them, and to interact appropriately with the general public to be moderately limited (Tr. at 245-246).  Such a limitation does not equate to a complete inability to work.  As a result, I find this factor supports the ALJ's finding.

### 6.  FUNCTIONAL RESTRICTIONS

The record does not reveal that Plaintiff's doctors ever placed him on any restrictions.

### B.  CREDIBILITY CONCLUSION

For all the reasons discussed above, I find that the record contains substantial evidence supporting the ALJ's finding that Plaintiff's allegations of a complete inability to work are not credible.  Plaintiff's motion for summary judgment on this basis is, therefore, denied.

### VI.  LISTING 12.04C(3)

Plaintiff argues that the ALJ erred in finding he did not have an impairment that met or equaled the requirements of Listing 12.04C(3).  This listing provides, in relevant part:

> 12.04 Affective disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> .  .  .
>
> C.       Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> .  .  .
>
> 3.       Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The record in this case does not support a finding that Plaintiff's impairments meet or equal this listing.  The record shows that Plaintiff has suffered from an affective disorder for at least two years that caused more than a minimal limitation of his ability to work.  Specifically, Plaintiff's medical records reveal he had been diagnosed with depression as early as, and likely even earlier than, 1999.  Symptoms of depression continue to be documented through June 28, 2004.

However, the record does not evidence a "history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  Plaintiff has lived at Rockhill Manor, a residential care facility, since

31

September of 2003.[19]  He testified at the October 28, 2004, hearing that he remained a resident of

Rockhill Manor.  The physician who examined Plaintiff upon admission noted he was "unable to

live alone and requires a sheltered living environment" due to "multiple medical and psychiatric

disorders" (Tr. at 283).  While this statement constitutes evidence that Plaintiff was unable to live

outside a sheltered environment on September 4, 2003, it does not prove that he remained unable

to do so over the course of the following year and beyond.  The most recent indication that

Plaintiff continued to need such an environment was Dr. Amiri's March 26, 2004,

recommendation that Plaintiff "maintain stable supportive housing placement providing him with

a safe environment to pursue his goals as he continues to learn coping skills to manage daily life

stressors contributing to feelings of depression and anxiety" (Tr. at 263).

  Moreover, Dr. Cools testified at the hearing that Plaintiff did not meet or equal listing

12.04 (Tr. at 50).  When questioned further by Plaintiff's counsel, Dr. Cools stated Plaintiff

would qualify for listing 12.04C(3) if there were evidence that Plaintiff continued to need to live

in a supportive living arrangement (Tr. at 50-51).  The record contains no such evidence.

Plaintiff relies on Ms. Webster's testimony that she did not think he could live independently due

to his current level of depression.  Ms. Webster's opinion is an "other source" under 20 C.F.R. §§

404.1513(d) and 416.913(d).  Absent her testimony on this issue, the record does not contain any

evidence that would indicate Plaintiff had a continued need for a supportive living arrangement.

In fact, the most recent medical evidence (Plaintiff's visits to TMC Behavioral Health on May

18, 2004, and June 28, 2004) indicates Plaintiff was experiencing minimal symptoms (Tr. at 251-

---

[19]Plaintiff lived at ReStart for a period of months before he lived at Rockhill Manor.  The record does not
contain evidence, however, that ReStart was a "highly supportive living arrangement."

Case 4:05-cv-00891-REL   Document 12   Filed 12/15/06   Page 32 of 34

254). As a result, Plaintiff's motion for summary judgment is denied on this ground.

## VII. VOCATIONAL EXPERT TESTIMONY

Plaintiff contends that ALJ's hypothetical questions to Mr. Knutson did not fully detail his impairments. Specifically, Plaintiff argues that the record does not contain substantial evidence that he could perform the jobs listed by Mr. Knutson "on a full-time basis, eight hours a day, five days a week." This claim of error seems to challenge the ALJ's determination that Plaintiff could perform work that existed in the national economy rather that the hypothetical questions posed to Mr. Knutson.

That is, the ALJ first asked Mr. Knutson whether a person with Plaintiff's age, education, and work experience could perform past relevant work if he needed to avoid interacting with the public, could follow simple instructions, needed to avoid concentrated exposure to dust, gases, fumes, odors and poor ventilation, should avoid close interaction with co-workers, but could maintain routine interaction with co-workers and supervisors (Tr. at 56-57). Mr. Knutson replied that such an individual could not perform past relevant work but could, instead, work as a packer, packager, assembler, warehouse laborer, production assembler, bench assembler, inspector, weigher, sampler, or checker (Tr. at 57-58). The ALJ next asked Mr. Knutson to assume such an individual could only maintain attention and concentration for extended periods of time for up to one third of the day (Tr. at 59). He responded the individual would not be employable (Tr. at 59).

A hypothetical question is proper if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). "The hypothetical question must capture the concrete consequences of the

33

claimant's deficiencies." Id. However, "the ALJ may exclude any alleged impairment that [he] has properly rejected as untrue or unsubstantiated." Id.

Here, the ALJ found that Plaintiff retained the residual functional capacity

> to perform work at all physical levels. He needs to avoid interacting with the public. He is able to follow simple instructions. He needs to avoid concentrated exposure to dust, gases, fumes, odors and poor ventilation. He needs to avoid close interaction with co-workers, such as being a member of a team, but he is able to maintain routine interaction with co-workers and supervisors.

(Tr. at 22). As is evident from the ALJ's questions to Mr. Knutson, the ALJ properly included the limitations he found Plaintiff suffered from based on Plaintiff's impairments. Although the ALJ also asked Mr. Knutson questions that considered an inability to maintain attention and concentration for extended periods of time, it was not erroneous for the ALJ to ultimately find Plaintiff could perform jobs other than his past relevant work since the ALJ did not find Plaintiff's residual functional capacity to include attention and concentration limitations. Summary judgment is thus denied on this basis.

### VIII. CONCLUSIONS

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 15, 2006

34